2024 IL App (1st) 220778-U

SECOND DIVISION
March 29, 2024

No. 1-22-0778,
consolidated with 1-22-0780 and 1-22-0789

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BURRINK COMMERCIAL SERVICES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Appeal from |
| NEW LIFE COVENANT CHURCH; and TOWER CONTRACTING, LLC, | ) | the Circuit Court |
| | ) | of Cook County |
| | ) | |
| Defendants-Appellees, | ) | 2018-CH-00865, cons. with |
| ----------------------------------------------------------------------- | ) | 2019-L-006974 |
| T.H. DAVIDSON & CO., | ) | |
| | ) | Honorable |
| Counterplaintiff-Appellant, | ) | Anthony C. Kyriakopoulos, |
| | ) | Judge Presiding |
| v. | ) | |
| | ) | |
| TOWER CONTRACTING, LLC, and NEW LIFE COVENANT CHURCH, | ) | |
| | ) | |
| Counterdefendants-Appellees. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  Circuit court did not err in dismissing subcontractors' factually deficient complaints to foreclose mechanics liens.

¶ 2    In this consolidated appeal, we address the dismissal of mechanics lien claims that were based on labor and materials provided by the plaintiffs to construct a temple for New Life Covenant Church at 7261 South Greenwood Avenue in Chicago. The circuit court found that the claims did not comply with the Illinois Mechanics Lien Act, 770 ILCS 60/0.01 *et seq.* (West 2018) (Act). In Appeal 1-22-0778, subcontractor Burrink Commercial Services (Burrink) argues that its seventh amended complaint did include the "brief statement of a claimant's contract" that is required by section 7 of the Act (770 ILCS 60/7(a) (West 2018)), even though the church argued that the subcontractor was improperly characterizing two contracts as one. Burrink also seeks review of the dismissal of its breach of contract claim. In Appeals 1-22-0780 and 1-22-0789, sub-sub-subcontractor T.H. Davidson & Co., Inc. d/b/a Welsch Ready Mix, Inc. (Welsch) disputes the findings that it (1) did not comply with section 11(b)'s requirement to sue "all persons in the chain of contracts between the claimant and the owner" (770 ILCS 60/11(b) (West 2018)) when it did not include the construction project's subcontractor as a defendant and that suing "Unknown Owners and Non-Record Claimants" did not suffice; and (2) failed to comply with section 24(a)'s notice requirement (770 ILCS 60/24(a) (West 2018)), when it did not allege that it served a subcontractor's 90-day notice after completion of its work, but did allege that it had "performed all conditions precedent" to bringing suit.

¶ 3    In its seventh amended complaint, Burrink alleged that New Life Covenant Church and Tower Contracting reached an agreement in April 2016 regarding general contracting services for the church's construction project and, in turn, Tower Contracting subcontracted earth moving tasks to Burrink. More specifically, the general contractor and the subcontractor came to an oral agreement on or before August 1, 2017 for "site preparation work" on a "time and materials" basis

and then they reduced their agreement to writing "[a] short time after August 1, 2017" in a document entitled "Purchase Order." Burrink's president, Brennden Burrink, executed the "Purchase Order" "[o]n or about July 8, 2017 [(sic)]" (a date that is prior to the oral agreement, the site preparation work, or the drafting of the written "Purchase Order"), and Tower Contracting's agent signed "[o]on or about August 9, 2017." During the site preparation tasks, Tower Contracting and Burrink discussed other tasks that "were not originally contemplated by the parties to the Purchase Order at the time the original written agreement was negotiated." Tower Contracting then prepared a written "Subcontract" regarding $560,000 worth of "Contract Extras" that included services such as backfilling surfaces, installing sanitary and storm water sewers and irrigation lines, digging retention ponds, and placing seed mats. Mr. Burrink executed the "Subcontract" on August 3, 2017, and Tower Contracting executed it on October 9, 2017.

¶ 4    Burrink further alleged that by January 26, 2018, it had completed all of the "Purchase Order work it was allow[ed] to perform" and some of the "Contract Extras." Also, the "work performed pursuant to the Purchase Order and the Contract Extras" created a "permanent and valuable improvement and enhancement" to the real estate, consisting of $353,972.71 in value that was attributable to the "Purchase Order" tasks and $85,539.50 in value that was attributable to the "Contract Extras." Tower Contracting paid $193,407.43 pursuant to the "Purchase Order" and $12,000 for the "Contract Extras." Burrink gave Tower Contracting a credit of $486,460.50 for "unfinished work pursuant to the Contract Extras, leaving a balance due in the amount of [$234,104.78]."

¶ 5    In Count I, entitled "Action to Foreclose Its Mechanics Lien Claim," Burrink sought $234,104.78 due and owing on "the outstanding balance" and supported by the pleading's Exhibit

E, which was a copy of an amended contractor's lien that had been filed with the county's recorder of deeds on or about December 1, 2021. We point out that in the recorded document, quoted below, Burrink (1) used the term "Purchase Order" interchangeably with the term "Contracted Work," (2) alleged that subsequently needed "additional services" were described in the "Change Order" which the parties had "labeled as the 'Subcontract,' " and, (3) without differentiating between the two agreements, stated that $234,104.78 was "justly due and owing," exclusive of interest charges and court costs:

> "AMENDED CONTRACTOR'S MECHANICS LIEN NOTICE AND CLAIM
>
> \*\*\*
>
> The undersigned claimant, **Burrink Commercial Services, Inc.,** by Brennden Burrink, president, of the Village of Lynwood, County of Cook, State of Illinois (the 'Claimant'), hereby claims a Contractor's mechanics lien pursuant to the Mechanics Lien Act of the State of Illinois, 770 ILCS 60/1, *et seq.* against **New Life Covenant Church SE** ('NLCCSE'), **Tower Contracting, LLC** ('Tower'), any Unknown Owners and Non-Record Claimants, regarding the property commonly known as 7621 South Greenwood, Chicago, County of Cook, State of Illinois (the "Property"), and states as follows
>
> \* \* \*
>
> 2. On or before August 1, 2017, \*\*\* **Michael Jarigese,** authorized agent of Tower on behalf of Tower and NLCCSE, orally offered to pay **Brennden Burrink,** the authorized representative of Claimant, a fair and reasonable price, based upon time and materials, to begin performing site preparation work at the property, the oral offer was later reduced to a written request for the mobilization of earthmoving equipment to start work on July 31

- 4 -

2017 using 2 CAT 263 D or 272D Skid Steers with buckets for loading and grading, and for the use of dump truck(s) along with operators for the equipment, as well as provide laborers for concrete curbs in order to begin relocating soil in Lot D and to haul to a building pad; grade soil in building pad and compact *** with compactor provided by Tower, at the direction of a Tower representative; load and haul away concrete located in lot C to Wright's in Markham, Illinois and collect and deliver CA Stone to the Property, thereafter to begin to [*(sic)*] other grading/backfilling operations at the direction of the Tower site superintendent; and 'Reorganization of operations scheduled for 7.7.2017 [sic]' in consideration of Claimant providing the equipment and performing the above described, Tower would pay on a time and materials basis per a Schedule attached to the document provided there were signed tickets (the 'Purchase Order') to be performed at the Property, **Brennden Burrink** on behalf of Claimant signed the Purchase Order on or about August 8, 2017 and **Michael Jarigese,** authorized agent of Tower executed the Purchase Order on behalf of Tower on August 9, 2017, (the 'Contracted Work') sometime during the course of the Contracted Work, **Michael Jarigese,** authorized agent of Tower submitted a written document which sought additional services from Claimant, including, but not limited to building a pad via compacting back fill with equipment rented by Tower; backfilling surface area with urban stockpile on site; perform structural excavation; complete and install 8" DIP Sanitary sewer to within 5' of property line; furnish and install 8" DIP water service line from 5' feet inside building foundation wall to within 5' of property line; perform rough grading; in Parking Lot D, complete storm water sewers at east entrance and east pond using materials on site; Parking Lot C, install storm water sewers and

- 5 -

detention as shown on plans, stopping at CHIC new property lines, cut site to grade, dig retention ponds, place seed mats over existing soil, if required, deliver and grade CA6 stone @ $22.76 per ton, backfill curbs and sidewalks within property lines, furnish and install irrigation lines, heads and complete system inside property lines; Parking Lot B, cut and fill parking lot to desired grade, dig retention ponds, place seed mats over existing soil; if required, deliver and grade CA6 stone @ $22.76 per ton, backfill curbs and sidewalks poured by others; furnish and install irrigation lines, head and complete system inside property lines; Parking Lot A, complete backfill of curbs and curb islands, demolish asphalt from existing alleyway in consideration of Tower paying Claimant a total price for the extra work of five hundred and sixty thousand dollars and zero cents ($560,000.00) all of the terms were reduced to written form (the 'Change Order'), and labeled as the 'Subcontract' which was accepted by Claimant via the signature of its authorized agent, **Brennden Burrink** on October 3, 2017, but not accepted by **Michael Jarigese,** authorized agent of Tower until October 9, 2017.

3. On January 26, 2018, Claimant performed one hundred percent (100%) of all Contracted Work with a value of $353,972.71, but was only allowed to perform $85,539.50 of the work contained in the Change Order that was necessary to complete the Claimant's portion of the construction work to improve the Property.

4. All of the labor and materials furnished and delivered by Claimant to improve the Property were furnished, delivered and performed, as contemplated under the Contract and Change Order which Tower allowed occurred on January 26, 2018.

5. There is now justly due and owing the Claimant after allowing to the Owners all

credits for Tower's payments under the Contracted Work of $193,407.43 and $12.000 under the Change Order for a payment credit of $205,407.43, and a credit for unfinished work of $486,460,50 for unfinished work under the Change Orders which leaves a balance due in the amount of **$234,104.78** plus interest at the rate specified in the Illinois Mechanics Lien Act since January 26, 2018.

6. Claimant now claims a lien on the above-described Property, and on all of the improvements thereon, against the Owners and all persons interested therein for the outstanding amount currently due of **$234,104.78,** after deductions of all payments and credits, plus interest at the rate specified in the Illinois Mechanics Lien Act, as well as court costs and attorneys' fees."

¶ 6    In Count II, entitled "Breach of Contract," Burrink sought $234,104.78 from Tower Contracting pursuant to the "Purchase Order and Extra Work." Exhibit A was the "Purchase Order." Exhibit B was the "Subcontract."

¶ 7    Count III was pled in the alternative—if the court found the "Purchase Order and Subcontract to be unenforceable," then Burrink sought $205,460.78 on the basis of the equitable theory of *quantum meruit*.

¶ 8    New Life Covenant Church filed a motion to dismiss Count I for failure to state a lien foreclosure claim because the recorded lien did not conform with the Act and was not enforceable. Tower Contracting filed a motion to dismiss Count II for failure to state a cause for breach of contract. After briefing and oral arguments, the circuit court granted the dismissals and ordered Burrink to release its lien within 35 days. Burrink voluntarily dismissed its *quantum meruit* count and the circuit court stayed enforcement of its order so that Burrink could take this appeal.

¶ 9    We review *de novo* an order granting a section 2-615 motion to dismiss for failure to state a cause of action. *K. Miller Construction Co., Inc. v. McGinnis*, 238 Ill. 2d 284, 291 (2010); 735 ILCS 5/2-615 (West 2018). Illinois is a fact pleading jurisdiction, not a notice pleading jurisdiction. *Teter v. Clemens*, 112 Ill. 2d 252, 256 (1986). A section 2-615 motion challenges the legal sufficiency of a complaint based on defects that are apparent on the face of the pleading. *K. Miller*, 238 Ill. 2d at 291. The court should grant the motion when no set of facts could be proven under the pleadings that would entitle the plaintiff to relief. *K. Miller*, 238 Ill. 2d at 291. Although a section 2-615 motion admits all well-pled facts as true, it does not admit conclusions of law or factual conclusions that are unsupported by allegations of specific facts. *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 457 (1995). The court may draw reasonable inferences from the well-pled facts. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 16. Nevertheless, if, after disregarding legal and factual conclusions, there are insufficient allegations of fact to state a cause of action, the motion should be granted. *Lake County Grading*, 275 Ill. App. 3d at 457. The complaint's factual allegations are to be interpreted in the light most favorable to the plaintiff, but in this fact-pleading jurisdiction, factual deficiencies cannot be cured by liberal construction. *Lake County Grading*, 275 Ill. App. 3d at 457; *Teter*, 112 Ill. 2d at 256. Exhibits that are attached to the pleading are considered to be a part of the pleading for all purposes where the pleading is founded on those exhibits. *Evers v. Edward Hospital Ass'n*, 247 Ill. App. 3d 717, 724 (1993). When allegations in the pleading conflict with the facts disclosed in the exhibits, the exhibit controls. *Evers*, 247 Ill. App. 3d at 724.

¶ 10    The statute at issue is a comprehensive "enactment that outlines the rights, responsibilities,

and remedies of parties to construction contracts, including owners, contractors, subcontractors, and third parties." *Cordeck Sales, Inc. v. Construction Systems, Inc.*, 382 Ill. App. 3d 334, 353 (2008).

> "[A mechanic's lien] is a remedy in the nature of a charge on land, given by statute to the persons named therein, to secure a priority or preference of payment for the performance of labor or supply of materials to buildings or other improvements, to be enforced against the particular property in which they have become incorporated, in the manner and under the limitations therein expressly provided. It is exclusively the creature of statute, deriving its existence only from positive enactment, and not arising out of, or of the essence of, the contract for labor ***[.] It is a mere incidental accompaniment as a means of enforcing payment, – a remedy given by law, which secures the preference provided for, but which does not exist, however equitable the claim may be, unless the party brings himself within the provisions of the statute[.]" *Mechanic's Lien*, Black's Law Dictionary (11th ed. 2019).

¶ 11 Since mechanics liens did not exist in the common law or in equity, but "only by virtue of statutes creating them and providing a method for their enforcement, those statutes must be strictly construed with reference to the requirements upon which the right depends." *Ronning Engineering Co., Inc. v. Adams Pride Alfalfa Corp.*, 181 Ill. App. 3d 753, 758 (1989); *CB Construction & Design, LLC v. Atlas Brookview, LLC*, 2021 IL App (1st) 200924, ¶ 26. A court should declare a mechanic's lien valid "only if each of the statutory requirements [has been] scrupulously observed." *Ronning Engineering*, 181 Ill. App. 3d at 758; *Delaney Electric Co. v. Schiessle*, 235 Ill. App. 3d 258, 264 (1992) ("a lien claimant who has met the prerequisites for bringing a lien

claim has merely acquired an inchoate right to a lien which must then be perfected in accordance with the requirements prescribed in the Act"). A contractor or subcontractor seeking to enforce its lien bears the burden of proving its adherence to each requirement. *Ronning Engineering*, 181 Ill. App. 3d at 759.

¶ 12    Once the party has complied with the statutory prerequisites, the Act is to be liberally construed in order to carry out its remedial purpose. *Ronning Engineering*, 181 Ill. App. 3d at 759 (citing the statute now found at 770 ILCS 60/39 (West 2018) ("This act is and shall be liberally construed as a remedial act.")). The purpose of the Act is to permit the imposition of an enforceable lien in order to protect a party that has increased or improved the value or condition of property by furnishing labor or materials. *Ronning Engineering*, 181 Ill. App. 3d at 759. Generally, a subcontractor's exclusive remedy against a property owner is through the Act because "the subcontractor has no contractual relationship with the owner which would give rise to a legal recovery." *Swansea Concrete Products, Inc. v. Distler,* 126 Ill. App. 3d 927, 932 (1984). A property owner should pay for improvements or other benefits that his or her conduct has induced or encouraged. *Cordeck Sales*, 382 Ill. App. 3d at 353 (internal quotation marks omitted).

¶ 13    We may not depart from the plain language and meaning of a statute by reading in exceptions, limitations, or conditions which the legislature did not include. *Mohammad v. Department of Financial & Professional Regulation*, 2013 IL App (1st) 122151, ¶ 10.

¶ 14    It is well-established that "filing a claim in conformity with section 7 of the statute is a condition precedent to the enforcement of a lien." *Christian v. Allee*, 104 Ill. App. 177, 183 (1902); *Cordeck Sales*, 382 Ill. App. 3d at 357 (quoting *Tefco Construction Co., Inc. v. Continental Community Bank & Trust Co.*, 357 Ill. App. 3d 714, 719 (2005) ("To properly perfect a lien claim

against either an owner or a third party, a mechanic's lien claimant must 'comply with the prerequisites in section 7 of the Act.' ")). Section 7 of the Act prescribes the timing and content of mechanics liens, stating, in relevant part:

> "(a) No contractor shall be allowed to enforce such lien against or to the prejudice of any other creditor or incumbrancer or purchaser, unless within 4 months after completion *** he or she shall either bring an action to enforce his or her lien therefor or shall file in the office of the recorder of the county in which the building, erection or other improvement to be charged with the lien is situated, a claim for lien, verified by the affidavit of himself or herself, or his or her agent or employee, which shall consist of *a brief statement of the claimant's contract*, the balance due after allowing all credits, and a sufficiently correct description of the lot, lots or tracts of land to identify the same." (Emphasis added.) 770 ILCS 60/7 (West 2018).

¶ 15    Strictly construed and reduced to its essence, "The plain language of section 7 instructs the lien claimant only to: (1) file the claim within four months after the completion of the work; (2) verify the lien by affidavit of the claimant or an agent or employee; (3) include a brief statement of the contract; (4) set forth the balance due; and (5) provide a sufficiently correct description of the lot, lots, or tracts of land to identify the same." *National City Mortgage v. Bergman*, 405 Ill. App. 3d 102, 108-09 (2010).

¶ 16    New Life Covenant Church and Tower Contracting did not dispute that Burrink satisfied section 7's first, second, fourth, and fifth requirements. 770 ILCS 60/7 (West 2018). They have persuaded us that Burrink's recorded amended lien claim did not accurately describe the underlying contracts, which is another way of saying that the amended document which Burrink

filed with the recorder of deeds did not meet section 7's third requirement to include "a brief statement of the claimant's contract" (770 ILCS 60/7 (West 2018)), and that the lien was, therefore, unenforceable. Burrink's error was that its recorded document indicated the company entered into a single written contract with Tower Contracting, consisting of the "Contracted Work" that was memorialized in the "Purchase Order" and the "additional services" that were described in the " 'Change Order' [that was] labeled as the 'Subcontract,' " as if the second contract modified the first contract, instead of being the stand-alone and unrelated agreement that it actually was. The recorded document stated one date (January 26, 2018) when "all Contracted Work" and some of "the work contained in the Change Order" had been completed and stated a single amount that was due and owing from "the construction work to improve the Property." The two contracts, however, are not an original agreement and its change order, they are two independent and unconnected contracts. Consequently, the lien did not comply with the statute's third requirement and was properly dismissed for this reason.

¶ 17    The first document, the "Purchase Order" is exactly that. A purchase order is "a document that asks a company to supply goods or services, and that gives details such as the price to be paid and the method and date of payment." *Purchase Order*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/purchase-order (last visited Dec. 21, 2023); *Purchase Order*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purchase%20order (last visited Dec. 22, 2023) ("a formal document that is used by an employee to request that something be purchased by a company"). A purchase order can be considered an offer, and if the supplier communicates acceptance of the terms, then the parties have formed a contract. See *McCarty v. Verson Allsteel Press Co.*, 89 Ill. App. 3d 498, 510

(1980) (where supplier assented to terms of purchase order and signed and returned purchase order to buyer, contract had been formed and supplier's inclusion of "Conditions of Sale" was ineffective).

¶ 18    The "Purchase Order" was generated by Tower Contracting, dated August 1, 2017, and addressed to Burrink Commercial Services in Lynwood, Illinois. Just below the address, Tower Contracting specified "Terms: F.O.B. Jobsite" and stated the address of the new church construction jobsite. The body of the purchase order was a short list of eight services that Burrink was to provide. As examples, the first three services were to "Mobilize 7.29.2017 and provide earthmoving equipment to start working 7.31.2017," "Deliver 2 CAT 262D or 272D skid steers with bucket for loading/grading;" and then "Provide operators for equipment[,] Provide operators for dump trucks[,] Provide laborers for concrete curbs." After the list of services, there was a list of five payment terms, the first three of which were "Pricing is T & M [Time & Materials] as per the attached Schedule, signed tickets are required;" "No taxes. This is a tax-exempt Project;" "Payment terms are paid 10 days from approval invoice." Both the "Vendor," Burrink and purchaser, Tower Contracting, signed and dated the bottom of this first page. The next two pages were an attachment that addressed Burrink's responsibility to maintain insurance coverage, including workers' compensation, comprehensive general liability, and comprehensive automobile liability coverage. Burrink and Tower Contracting initialed the insurance page. The concluding page of the four-page document was another brief, typewritten list that filled only the top third of the page. Here were the "Breakout Cost[s]" for services that Burrink was agreeing to provide during the "Estimated Construction Duration" of "1 week" such as a "John Deere 444 Wheel Loader (older) with Operator & Fuel: $90.00/Hourly," "Operator for Rented Compactor: $65.00/

Hourly," and "Concrete Laborer: $75.00/Hourly." In other words, the four-page Purchase Order consisted of a concise, one-page list of tasks and payment terms, some boilerplate language about insurance coverage, and a half-page list "break[ing]out" the costs.

¶ 19    In contrast, the "Subcontract" is a formal and detailed document that appears to be Tower Contracting's form contract, dated October 3, 2017, and consisting of 26 typewritten pages with attachments, complete sentences and punctuation, numbered articles, numbered sections, subtitled paragraphs, and consecutive numbers for every line of every page of the contract.

¶ 20    This so-called " 'Change Order' [that was] labeled as the 'Subcontract,' " was *not* accurately described as a "change order" to the four-page purchase order, because it was an independent contract that did not alter the prior agreement. A "change order" is "a written alteration to a previously signed contract for work (as in construction)." *Change Order*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/change%20order (last visited Dec. 22, 2023). It can "alter[] the work, the contract sum, or the contract time." *Change Orders: What They Are and How To Manage Them*, Ironclad Journal, https://ironcladapp.com/journal/contracts/change-orders/ (last visited Dec. 22, 2023). It allows parties "to come to an agreement on any alterations to the contract terms without needing to scrap the original." *Id*. "It acts as an extension of the contract and ensures that all parties understand their new duties and expectations. It codifies the specific changes the client wants, and provides legal notice of any adjustments to the price and timeline that the client should expect." *Id*. Entering into a change order is prudent when the "client requests alterations to a project after the contract's effective [start] date" or the parties "discover new information (such as previously-undisclosed limitations or new legislation) that adjusts a project's scope after getting started." *Id*. The change

order creates a "paper trail" that the parties have agreed to deviate from their existing contract. *Id*. In *Loewenberg/Fitch Partnership v. State*, 38 Ill. Ct. Cl. 227, 228 (1986), an architectural firm brought a claim regarding uncompensated "additional work" that it provided during the construction of an office and laboratory building on the Illinois State fairgrounds in Springfield, Illinois. Part of the additional work involved the mechanical systems. "[W]hen the building was originally designed, natural gas was unavailable. Later natural gas restrictions were removed and [the architects] were directed to revise the design per change order so a combination of gas and oil could be used." *Id*., at 235. During the project there were also "new regulations for handicap access," so the architects "had to go back and design ramps for the handicapped per change order." *Id.*, at 237. The subsequent payment dispute, however, also encompassed heating and piping work that was described in a lengthy and comprehensive document. One of the witnesses testified about this later-executed document, indicating, "This was not a normal change order. [The witness would] ordinarily review change orders as part of basic contract administration, but this one was entirely different in that it was 516 pages long. In 24 years he had never reviewed a document of this volume or detail. He felt it was not included in the contract." *Id.*, at 234. Burrink incorrectly stated in its recorded amended lien claim that the "Purchase Order" was altered when "terms were reduced to written form (the 'Change Order'), and labeled as the 'Subcontract.' "

¶ 21     The "Subcontract" was not a change order to the "Purchase Order," because it had no impact on the earlier contract. It did not indicate in any way that the parties were altering an existing arrangement. The parties did not, for instance, entitle their second agreement as a "change order," or a contract amendment. The title "Subcontract" was apparently a reference to the fact that the construction project's general contractor was hiring another firm to perform some of the

specific tasks that were within that firm's expertise. See *Contract*, Black's Law Dictionary (11th ed. 2019) (defining a "subcontract" as "[a] secondary contract made by a party to the primary contract for carrying out the primary contract, or a part of it"). Arguably more important than the title of the "Subcontract" are its contents and the fact that it did not refer to the "Purchase Order" and did not modify the scope of any work, change any services, revise any start or completion dates, or update any prices or fees that the parties had previously agreed upon. There is no indication in the "Subcontract" that the parties were creating a paper trail to document small changes to their "Purchase Order." The two contracts read as two separate agreements.

¶ 22    In fact, Burrink, which retained new counsel to file the pleading at issue and take this appeal, now "concedes these are two distinct contracts" and that the "two agreements involved completely different types of work." Burrink even contrasts the supervision and services to be provided pursuant to the contracts, stating: "The Purchase Order was for site preparation, performed under Tower's direct supervision and responsibility. The Subcontract, on the other hand, was for independent construction work for which Burrink was responsible." Burrink also contrasts the payment arrangements, pointing out: "The [supervised site preparation] work under the Purchase Order was paid on a time and materials basis. Whereas Tower's Subcontract offered a fixed price of $560,000 to [independently] perform the construction work." Burrink draws these distinctions as it tries to persuade us that its recorded amended lien claim also "distinguished between the two agreements with Tower," and thus complied with section 7's requirement to provide a "brief statement of the contract." 770 ILCS 60/7(a) (West 2018). It is our opinion that, in its recorded amended lien claim, Burrink mislabeled the "Subcontract" as a "Change Order" and muddled together the parties' two unconnected agreements as if they were a single but

modified contract. Burrink's erroneous description was a substantial and material departure from section 7's requirement that the lien claim include "a brief statement of the contract." 770 ILCS 60/7 (West 2018).

¶ 23    In a similar case, *Ronning Engineering*, the appellate court affirmed the dismissal of the plaintiff's lien foreclosure claim because the lien contained an inaccurate description of the underlying contract. *Ronning Engineering*, 181 Ill. App. 3d 753. In its complaint, the plaintiff alleged that it rendered engineering services for the construction of a manufacturing plant pursuant to a verbal contract it reached with Adams Pride Alfalfa Corporation on or about July 1, 1986. *Ronning Engineering*, 181 Ill. App. 3d at 755. However, in its recorded document, it alleged the lien was based on a written contract executed nearly a year prior, on September 20, 1985, and although the attached contract bore that September date, it was between the plaintiff and Adams County Joint Venture (instead of Adams Pride Alfalfa Corporation) and concerned a feasibility study for an alfalfa processing plant. *Ronning Engineering*, 181 Ill. App. 3d at 755-56. In other words, there were numerous discrepancies between the lien and the attached contract. The court held that the lien was unenforceable because it did not contain "a sufficient statement of the contract forming the basis of the claims" as required by section 7. *Ronning Engineering,* 181 Ill. App. 3d at 759.

¶ 24    The lien in *Candice* identified Candice as the claimant and erroneously stated that on August 6, 1992, Candice had contracted with Bellwood, Illinois property owner "La Von L. Ricketts & Trina Ann Malone and any other unknown owner to [r]emodel basement." *Candice Co., v. Ricketts*, 281 Ill. App. 3d 359, 363 (1996). Candice, however, was not a party to the attached remodeling contract which Ricketts and Malone had entered into with a home repair and

remodeling corporation that was known as Father and Sons, Inc. *Candice*, 281 Ill. App 3d at 363. Father and Sons had completed the work in the basement and then assigned its mechanics lien rights to Candice. *Candice*, 281 Ill. App 3d at 360. Misstating the names of the contracting parties was the only defect in the lien. After considering the statute's language and *Ronning Engineering*, the court affirmed the trial judge's dismissal of the action, reasoning that the lien "incorrectly describes the parties to the contract on which the lien is purportedly based, and, therefore, does not [strictly comply with] the requirements of section 7." *Candice*, 281 Ill. App 3d at 364.

¶ 25    Another instructive case is *Bale*, in which Carla S. Bale completed a preprinted lien claim form on behalf of Martin L. Bale, d/b/a Bale Excavating and Farm Drainage, regarding Mr. Bale's creation of a one-acre pond for which he was owed $8,540.82. *Bale v. Barnhart*, 343 Ill. App. 3d 708 (2003). In the caption and some other places on the form, Ms. Bale correctly identified Mr. Bale as the claimant, but in other places, she misidentified herself as the claimant. *Bale*, 343 Ill. App. 3d at 713. In light of *Ronning Engineering* and *Candice*, the court held that the lien was unenforceable. *Bale*, 343 Ill. App. 3d at 714. "At a minimum, the conflict [between the caption and the body of the claim for lien] creates an ambiguity that results in an inaccurate description of the contract. Strictly construing the Act, we find the claim for lien fails section 7." *Bale*, 343 Ill. App. 3d at 714.

¶ 26    Here, Burrink made a substantial and material error when it inaccurately described the contract upon which the lien was based. Given the language of the statute, the fact that mechanics lien rights did not exist at common law, and the precedent discussed above which interpret a lien claimant's obligation to provide a "brief statement of the contract," we find that the lien at issue did not strictly comply with section 7 of the Act. Burrink erred because it entered into two, not one

contract, and it formed these agreements on different dates, for different services, and for different amounts. The amended lien does not accurately describe the contract or contracts it is based upon and instead blurs the agreements into a single contract for which one amount remains unpaid.

¶ 27     In support of its argument that the lien did provide a sufficiently accurate "brief statement," Burrink cites *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, which is distinguishable. *North Shore* concerned the construction of a commercial building at 2954-58 North Sheffield Avenue in Chicago. *North Shore*, 2014 IL App (1st) 123784, ¶ 6. The subcontractor and property owner never entered into a singular, integrated contract, so in order to prove a $101,755 mechanic's lien claim, the subcontractor produced a self-prepared timeline of the construction project; a series of e-mails that it exchanged with the owner; and a transcript of the subcontractor's deposition. *North Shore*, 2014 IL App (1st) 123784, ¶¶ 21-26. The e-mails between the subcontractor and the owner contained "various proposals and change orders," memorialized approvals which the owner had given during site meetings, and documented "payment issues" and "open invoices." *North Shore*, 2014 IL App (1st) 123784, ¶¶ 21-26. At his deposition, the subcontractor testified that the owner frequently agreed to proposals and change orders over the phone or during site meetings. *North Shore*, 2014 IL App (1st) 123784, ¶ 16. The subcontractor also tendered an affidavit from the general contractor which confirmed that the owner had accepted a change order regarding concrete work. *North Shore*, 2014 IL App (1st) 123784, ¶ 31. Thus, although the lien claimant could not rely on one, definitive written agreement, he produced e-mails with the owner and evidence of their conversations in order to prove the terms of their contract. *North Shore*, 2014 IL App (1st) 23784, ¶ 31.

¶ 28     Burrink cites *North Shore* because the court rejected the argument that the lien was

defective because it described the parties' agreement as a "written contract." *North Shore*, 2014 IL App (1st) 23784, ¶ 139. The court criticized the appellees' reliance on *Ronning Engineering* and *Candice*, pointing out that this precedent did not require that "a description of a contract be absolutely correct and perfect to be enforceable." *North Shore*, 2014 IL App (1st) 123784, ¶ 141. "On the contrary, the language used by both courts suggests that a lien claim need only a *sufficiently* correct description of a contract to be enforceable." (Emphasis in original.) *North Shore*, 2014 IL App (1st) 123784, ¶ 141. Also:

> " 'The doctrine of strict construction was never meant to be applied as a pitfall to the unwary, in good faith pursuing the path marked by the statute, nor as an ambuscade from which an adversary can overwhelm him for an immaterial misstep. Its function is to preserve the substantial rights of those against whom the remedy offered by the statute is directed, and it is never employed otherwise.' " *North Shore*, 2014 IL App (1st) 123784, ¶ 93 (quoting *United Cork Cos. v. Volland*, 365 Ill. 564, 572 (1937)).

¶ 29    The court characterized the subcontractor's misuse of the term "written contract" as an imperfection that was "nowhere near as grievous" as the material mistakes that were apparent on the face of the *Ronning Engineering* and *Candice* liens. *North Shore*, 2014 IL App (1st) 123784, ¶ 143. Although the *North Shore* subcontractor did not have "a singular, 'written' contract signed by the parties," he had produced sufficient evidence of a written agreement for purposes of section 7. *North Shore*, 2014 IL App (1st) 123784, ¶ 143.

¶ 30    *North Shore* does not further this appeal, however, because Burrink's misdescription of its two contracts was not "*sufficiently* correct" (*North Shore*, 2014 IL App (1st) 123784, ¶ 141) and was not an error that can be sloughed off as an "immaterial misstep" (*North Shore*, 2014 IL App

(1st) 123784, ¶ 93 (quoting *United Cork*, 365 Ill. at 572)) in the lien claim process. *North Shore*'s indication that a lien does not need to be blemish-free does not overcome Burrink's erroneous description of its two unrelated construction contracts as a singular, modified contract for which one amount was due. Burrink's mistake was as significant as *Ronning Engineering*'s attachment of the wrong contract, and *Candice* and *Bale*'s misstatement of the names of the contracting parties.

¶ 31    We conclude that Burrink's failure to comply with section 7 of the Act justified the dismissal of Count I of its seventh amended complaint.

¶ 32    We briefly address Count II of the seventh amended complaint in which Burrink sought damages for Tower Contracting's breach of contract. "A complaint based upon breach of contract must allege the existence of the contract, including allegations indicating an offer, acceptance and consideration, the plaintiff's performance of all contractual conditions required of him, the fact of the defendant's alleged breach, and the existence of damages as a consequence." *Nuccio v. Chicago Commodities, Inc.*, 257 Ill. App. 3d 437, 443 (1993). An allegation that a contract exists, without allegations of supporting facts, is a legal conclusion and is insufficient. *Id.*, at 443-44. The use of "[t]erms such as 'offered,' 'accepted,' and 'breached its contract' suggest mere legal conclusions." *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 380 (1994) (quoting *Wait v. First Midwest Bank/Danville*, 142 Ill. App. 3d 703, 707-08 (1986)).

¶ 33    Count II contained confusing allegations that a contract was formed and ultimately the pleading did not factually state a cause of action for breach. Count II included the allegation, "7. On or before August 1, 2017, [Tower Contracting ] orally offered to pay [Burrink] a fair and reasonable price, based upon time and materials, to begin performing site preparation work at the

property." Next, "8. A short time after August 1, 2017, the oral offer *** was reduced to a written request [for various services] (the 'Purchase Order') (Exhibit 'A')." Confusingly, however, Burrink alleged that it was able to jump back in time: "9. On or about July 8, 2017, Brennden Burrink [on behalf of his company] accepted the offer *** and executed the Purchase Order." But then, weeks later, "10. On or about August 9, 2017 [Tower Contracting] also executed the Purchase Order."

¶ 34    In a section 2-615 proceeding, the court is asked to determine whether all the well-pled facts, viewed in the light most favorable to the plaintiff, and all *reasonable* inferences that may be drawn from those facts, if taken as true, are sufficient to state a cause of action upon which relief may be granted. (Emphasis added.) *Doe-3*, 2012 IL 112479, ¶ 16. This pleading did not factually indicate that the parties contracted, because it stated that Burrink accepted a written offer about a month before the offer was made. Either the dates in paragraphs 7, 8, and 10 were correct, or the date in paragraph 9 was correct, but it is impossible to read them together as an offer, acceptance, and thus, formation of a contract.

¶ 35    When allegations in a pleading conflict with the facts disclosed in the exhibits, the exhibit controls. *Evers*, 247 Ill. App. 3d at 724. In this instance, however, the attached document contained the same incompatible dates.

¶ 36    Burrink unpersuasively argues that the circuit court should have reasonably inferred that the allegation "July 8, 2017" actually meant "August 7, 2017," and "It is not an unreasonable inference to draw that [Mr.] Burrink could have confused whether to put the day first or the month when dating the Purchase Order." We disagree. What occurred here was more than an obvious transposition of digits. Burrink can cite no authority for the proposition that a court should correct

a pleading by "inferring" an entirely different month and day than the month and date that the plaintiff alleged. It would have been unreasonable to assume from an allegation of a specific date that the plaintiff intended an entirely different date, particularly when this was the plaintiff's seventh amended complaint, that is, it was Burrink's *eighth attempt* to state a viable cause of action. This pleading did not factually indicate that there was a contract, and, without a contract, there was no claim for breach of contract.

¶ 37    Continuing with the pleading, Burrink erroneously alleged, as it had in the lien, that two contracts were a single agreement: "11. *** Tower [Contracting] submitted a written document which was titled 'Subcontract' which sought additional services from Claimant (the 'Contract Extras')." As discussed above, the two agreements were separate and unrelated agreements, to be read separately. Furthermore, sections 2.3 and 14.5 of the "Subcontract" precluded reading that contract as part of the earlier "Purchase Order:"

"ARTICLE 2[,] SCOPE OF WORK

* * *

2.3 The parties agree that the Agreement contains all terms and conditions agreed upon between them and that all prior conversation, understandings, agreements, promises, letters, quotations, qualifications, and writings are null and void unless they are specifically included herein.

* * *

ARTICLE 14[,] CONTRACT INTERP[RE]TATION

* * *

14.5 Entire Agreement. This Agreement is solely for the benefit of the signatories

hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations or agreement, either written or oral."

¶ 38    Sections 2.3 and 14.5 are known as integration clauses and they prevented the court from treating the two contracts as one. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464-65 (1999) ("An integration clause is a clause which provides that any prior negotiations leading up to the contract are subsumed in the contract and that the contract is complete in itself.") When an integration clause is included in a written agreement, the four corners rule applies and extrinsic evidence regarding the parties' intention is not admissible to interpret the agreement. *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521-22 (2001). Here, the integration clauses contradicted and defeated the allegation that the "Subcontract" was an additional part of the "Purchase Order" and that together, the documents evidenced a single agreement between the parties. Accordingly, the circuit court did not err in dismissing Count II for failure to plead a cause of action for breach of contract, and we affirm that part of the order.

¶ 39    Furthermore, although not dispositive of the pleading, since the contracts were separate agreements, the civil practice rules made it improper for Burrink to combine its two contract claims into a single count of the pleading. Section 2-603(b) of the Code of Civil Procedure (Code) states:

> "Each separate cause of action upon which a separate recovery might be had shall be stated in a separate count or counterclaim, as the case may be and each count, counter-claim, defense or reply, shall be separately pleaded, designated and numbered, and each shall be divided into paragraphs numbered consecutively, each paragraph containing, as nearly as may be, a separate allegation." 735 ILCS 5/2-603(b) (West 2018).

¶ 40    Section 2-613(a) of the Code provides: "Parties may plead as many causes of action,

counterclaims, defenses, and matters in reply as they may have, and each shall be separately designated and numbered. 735 ILCS 5/2-613(a) (West 2018). Together, section 2-603(b) and 2-613(a) indicate that the plaintiff should have stated its separate causes of action in separate counts. We find no error in the circuit court's decision to dismiss Burrink's complaint.

¶ 41    Our next consideration is the dismissal of the other appellant's complaint for failure to state a cause of action, but for different reasons than those discussed above. Appellant Welsch filed a verified third-party complaint that indicated the following. New Life Covenant Church, as the fee simple owner of 7621 South Greenwood Avenue, contracted with Tower Contracting to complete a project on the church's property. Tower Contracting then entered into a subcontract with Continental Construction Company (Continental Construction), which entered into a subsubcontract with ECO Construction, Inc. (ECO Construction), which entered into a sub-subsubcontract with Welsch. Welsch is an Illinois business based in Oak Forest that supplies readymix concrete to construction projects. Pursuant to its agreement with ECO Construction dated May 22, 2018, Welsch provided concrete for the project and substantially completed its contractual obligations on or about December 6, 2018. Welsch alleged that it enhanced the value of the subject property by $294,256.55, and that after ECO Construction paid Welsch $147,708.82, Welsch was owed $146,547.73. Welsch recorded a lien on March 14, 2019 and attached a photocopy of the document to its pleading.

¶ 42    Welsch also alleged, "57. Welsch has performed all conditions precedent to the bringing of action [*(sic)*]." Welsch did not also allege, however, that its lien claim was preceded by serving New Life Covenant Church and Tower Contracting with a subcontractor's 90-day notice after the completion of its work.

¶ 43    In count I, Welsch sought foreclosure of its lien against the real estate. In count II, Welsch asserted its statutory right to damages from New Life Covenant Church and Tower Contracting. Count III was a breach of contract claim against ECO Construction. Count IV was Welsch's *quantum meruit* claim against New Life Covenant Church, Tower Contracting, Continental Construction, and ECO Construction.

¶ 44    We emphasize that Welsch did not name Continental Construction as a defendant to the suit. Furthermore, in the introductory paragraph of its suit, Welsch recited all of the defendants' names, but did not include Continental Construction.

¶ 45    New Life Covenant Church filed a motion to dismiss counts I, II and IV with prejudice, because Welsch had failed to name all of the parties in the chain of contracts between itself and the property owner, and also failed to allege that it provided a subcontractor's 90-day notice to all of the necessary parties before recording its lien. In a separate motion, Tower Contracting adopted the church's arguments and added an argument which is not at issue on appeal.

¶ 46    After briefing and oral arguments, the circuit court dismissed counts I, II, III, and IV with prejudice as to New Life Covenant Church and Tower Contracting and ordered Welsch to file a release of claim with the Cook County Recorder of Deeds. The court dismissed Count IV without prejudice as to ECO Construction, gave Welsch leave to amend Count IV as to ECO Construction only, and also indicated that there is no just reason to delay the enforceability or appeal of the final order pursuant to Supreme Court Rule 304(a). See Ill. S. Ct. Rule 304(a) (eff. Mar. 8, 2016).

¶ 47    On appeal, with respect to its failure to name subcontractor Continental Construction as a defendant when the company was a necessary party, Welsch argues that Continental Construction was a nonrecord claimant that Welsch encompassed by generally naming "Unknown Owners and

Non-Record Claimants" as defendants. The following defendants were named in the caption of Welsch's verified third-party complaint, and repeated in the first paragraph of the pleading:

"New Life Covenant Church-SE f/k/a New Life Covenant Oakwood, Inc., Tower Contracting LLC, Foundation Capital Resources, Inc., Action Fence Contractors, Inc., Ahern Rentals Inc., Landscaping Services, Inc., Sunbelt Rentals, Inc., Masterlink Concrete Pumping, L.L.C., Miller's Eureka, Inc., Jay Bee Builders, LLC, Burrink Commercial Services, Inc., Chicago Gypsum Supply, Inc. d/b/a M.R. Lee Building Materials, Seal Tight Exteriors, Inc., Carter's Excavating & Grading Company, HERC Rentals Inc., Midwest Crane Rental, Inc., Illini Architectural Products Company, City of Chicago, City of Chicago Department of Water Management, ECO Construction, and Unknown Owners and Non-Record Claimants in the Real Estate and all persons who claim and [(*sic*)] interest by, through, or under Owner."

¶ 48    Welsch relies on section 11(c), rather than on section 11(b), of the Act. Those sections state:

"(b) *Each claimant shall make as parties to its pleading* (hereinafter called 'necessary parties') the owner of the premises, the contractor, *all persons in the chain of contracts between the claimant and the owner* [(emphasis added)], all persons who have asserted or may assert liens against the premises under this Act, and any other person against whose interest in the premises the claimant asserts a claim.

(c) Necessary parties whose claims or interests are not disclosed by a document recorded at the time a proper *lis pendens* of the action under Section 2-1901 of the Code of Civil Procedure has been recorded (or if the action is instituted as a mortgage foreclosure

at the time a proper notice of foreclosure under Section 15-1503 of the Code of Civil Procedure has been recorded) may be named and made parties under the description of *'unknown necessary parties'* [(emphasis added)]. Persons other than unknown necessary parties who may be interested in the premises *but whose identities are unknown to the claimant* may be named and made parties to the action under the description of *'unknown owners.'* [(emphasis added)]." 770 ILCS 60/11(b), (c) (West 2018).

¶ 49    Welsch contends it made an "honest mistake" by not making Continental Construction a party pursuant to section 11(b) because when Welsch searched the property's title, Continental Construction had not recorded a lien against the property. According to Welsch, this fact made it appear that Continental Construction could be described as a "necessary party" that was "not disclosed" by any recorded document and that Welsch would be correct in relying on section 11(c) instead of section 11(b).

¶ 50    Continuing, Welsch points out that the Continental Construction corporation was involuntarily dissolved by the Illinois Secretary of State as of December 13, 2019, which was a few weeks before Welsch petitioned the circuit court on January 20, 2020 for leave to intervene and file its own complaint in the ongoing mechanics lien litigation that arose from the church's construction project. Furthermore, during the years that Welsch's claim was pending in the circuit court, Continental Construction did not record a lien, petition to intervene in Welsch's suit, or file its own action. To Welsch, these are indications that Continental Construction had and has no interest in these proceedings and did not have to be named. Welsch cites *Bingaman v. Dahm*, 307 Ill. App. 3d 432, 438 (1940), for the proposition "that it is only necessary that 'all persons who are known to have any interest, either legal or equitable, in the land, or any claim for lien against,

should be joined either as plaintiffs or defendants.' " Also, [c]ourts endeavor to protect parties to any action, as well as those who have rights which should be protected and included within the purview of the [statute] under which the action is instituted, but *** do not engage in futile acts simply to adhere to a technical rule of procedure." *Bingaman*, 307 Ill. App. 3d at 439. Welsch contends that the dismissal of its complaint was based on a technicality and a futile act that did not benefit Continental Construction.

¶ 51     Welsch also argues that the dismissal is against public policy and equitable principles because it precludes an "[h]onest, hard-working subcontractor[]" from collecting payment for its work. Welsch emphasizes that although mechanics liens exist by virtue of a statute, they are essentially equitable claims. See *National City Mortgage v. Bergman*, 405 Ill. App. 3d 102, 111 (2010) ("a suit under the Act is a suit in equity and equitable principles must apply"). *Cf. Springfield Heating and Air Conditioning, Inc. v. 3947-55 King Drive At Oakwood, LLC*, 387 Ill. App. 3d 906, 914 (2009) ("the rights afforded by the Act are purely statutory in nature and are not governed by the rules of equitable jurisprudence"); *Wingler v. Niblack*, 58 Ill. App. 3d 287, 289 (1978) (lien rights are "entirely governed by the Act and not by the rules of equity jurisprudence"). Welsch concludes that equity requires that the property owner and its project contractor pay Welsch for its work rather than argue about an "unprejudicial technicality based on a picayune reading of the Act."

¶ 52     New Life Covenant Church, in a brief that Tower Contracting has adopted as its own, responds that the controlling statute is section 11(b), not section 11(c), of the Act; that even if section 11(c) had been controlling, Welsch failed to name " 'unknown necessary parties' " as defendants; and that *Bingaman*'s concerns are being quoted out of context.

¶ 53    We consider *Bingaman*, 307 Ill. App. 3d 432, to be generally relevant, even though the parties that were omitted in that case were outside the chain of contracts between the property owner and the plaintiff. The opinion tells us that the omission of a necessary party in a mechanics lien foreclosure case, if such objection is properly raised, deprives a foreclosing lien claimant of his right to proceed until he makes such necessary party a party to his proceeding. *Bingaman*, 307 Ill. App. at 438. The Act "contemplates one suit and that all persons who are known to have any interest, either legal or equitable, in the land, or any claim for lien against it, should be joined either as plaintiffs or defendants so that the court will be able to adjust all equities and render a decree in relation to the distribution of the proceeds." *Bingaman*, 307 Ill. App. at 438. The property owner should not be harassed with a multiplicity of suits and burdened with the associated costs and expenses. *Bingaman*, 307 Ill. App. at 438.

¶ 54    Sub-sub-subcontractor Welsch is advocating for us to excuse its failure to include subcontractor Continental Construction in this mechanics lien action and disregard the certainty of section 11(b)'s statement that "[e]ach claimant *shall* make as parties to its pleading *** *all persons in the chain of contracts* between the claimant and the owner." (Emphasis added.) 770 ILCS 60/11(b) (West 2018). Welsch relies mainly on *Bingaman*, in which the court declined to reverse a judgment for the plaintiff lien claimant which had not named certain other potential lien claimants. *Bingaman*, however, is distinguishable from this case, in that (1) the nonjoined parties were outside the chain of contracts between the plaintiff and the defendant, and thus stood in a different relationship than Welsch and Continental Construction, and (2) the court was not contemplating any statute, let alone the statutory language at issue here. *Bingaman*, 307 Ill. App. 432. *Bingaman* is not helpful in determining the outcome of this appeal. We would have to rewrite

- 30 -

section 11(b) in order to create an exception for Welsch on grounds that its purported title search did not result in any indication that Continental Construction had a pending lien claim on the church's property, or on grounds that Continental Construction's corporate status had been administratively dissolved. Although Welsch argues that we would be accommodating an inconsequential "technical" error in its complaint, Welsch is minimizing the significance of its error and the corresponding significance of its appellate argument. The legislature used the word "shall" in this statute, and when the legislature employs this particular word, generally, the legislature is stating an unavoidable requirement. See *In re Marriage of Takata*, 304 Ill. App. 3d 85, 95 (1999) ("Under the rules for statutory construction, the word 'shall' ordinarily connotes a mandatory obligation, unless the context of the statute indicates otherwise."); *Hoffman Estates Professional Firefighters Ass'n v. Village of Hoffman Estates*, 305 Ill. App. 3d 242, 253 (1999) ("Legislative use of the word 'shall' is generally considered to express a mandatory reading."). The statutory requirements must be scrupulously observed. *Ronning Engineering*, 181 Ill. App. 3d at 758. The statute required Welsch to make Continental Construction a party to the suit—despite any opinion that Welsch might have formed about the subcontractor's interest in the litigation. It is not our role to rewrite legislation. Any expansion or contraction of the statutory language under the guise of statutory construction would be impermissibly exercising a legislative function. We may not depart from the plain language and meaning of the statute by adding an exception for Welsch. *Mohammad*, 2013 IL App (1st) 122151, ¶ 10 (courts do not read in unstated exceptions, limitations, or conditions to statutes); *Hill Behan Lumber Co. v. Irving Federal Savings & Loan Ass'n*, 121 Ill. App. 3d 511, 516 (1984) ("This court cannot add words to a statute to change its meaning.")

¶ 55    Furthermore, even if we assume for purposes of argument that section 11(c) states an alternative to section 11(b), Welsch did not conform with section 11(c). Section 11(c) states in relevant part:

> "Necessary parties whose claims or interests are not disclosed by a document record-ed at the time a proper *lis pendens* of the action under Section 2-1901 of the Code of Civil Procedure has been recorded (or if the action is instituted as a mortgage fore-closure at the time a proper notice of foreclosure under Section 15-1503 of the Code of Civil Procedure has been recorded) may be named and made parties under the description of 'unknown necessary parties'." 770 ILCS 70/11(c) (West 2018).

¶ 56    The suit caption that we quoted above shows that Welsch did not sue " 'unknown necessary parties.' " Instead, Welsch sued "Unknown Owners and Non-Record Claimants in the Real Estate." Welsch cites no language in section 11(c) or elsewhere in the Act that would allow Welsch to include "Unknown Owners and Non-Record Claimants" in the caption and preamble of its pleading, let alone allow it to designate a party that is in the chain of contracts, like Continental Construction, as such. Instead, Welsch cites to an entirely different and irrelevant statute, the Illinois Mortgage Foreclosure Act, 735 ILCS 5/15-1210 (West 2018), as the source of the term "nonrecord claimant." Welsch brought its claim under the statute that is specific to mechanics lien claims (770 ILCS 60/0.01, *et seq.* (West 2018)) and that is the statute that governs our analysis. Welsch's resort to an irrelevant statute regarding mortgagors and mortgagees is not convincing. Similarly, Welsch's resort to an irrelevant section of the Act regarding " "unknown necessary parties' " is not persuasive when Welsch knew of Continental Construction's existence and had no legitimate reason to omit that known entity from these proceedings.

¶ 57    Section 9 of the Act states, "[i]f payment shall not be made to the contractor having a lien by virtue of this act of any amount due when the same becomes due, then such contractor may bring suit to enforce his lien in the circuit court in the county where the improvement is located." 760 ILCS 60/9 (West 2018). Also, [s]uch suit shall be commenced or counterclaim filed within two years after the completion of the contract." 770 ILCS 60/9 (West 2018). A lien claimant must commence a suit and join necessary parties within the time limits of the Act to avoid forfeiting the lien. *CB Construction*, 2021 IL App (1st) 200924 at ¶ 30. In *CB Construction,* upon the completion of a nearly $10 million renovation of an apartment building, the owner refused to pay the contactor about $1.4 million remaining under the parties' contract, which prompted the contractor to file a mechanics lien against the property. *CB Construction*, 2021 IL App (1st) 200924, ¶ 6. The owner then served the contractor with a demand pursuant to section 34 of the Act, requiring the contractor to file a lawsuit within 30 days to enforce its lien, despite the usual two year period for filing suit provided by section 9 of the Act. 760 ILCS 60/9, 34 (West 2018); *CB Construction*, 2021 IL App (1st) 200924, ¶ 7. The contractor filed a complaint within the 30 days, but failed to name two parties that had financial interests in the property. *CB Construction*, 2021 IL App (1st) 200924 ¶ 8. One of the missing defendants was the mortgage lender and the other missing defendant was the assignee of rents from the property. *CB Construction*, 2021 IL App (1st) 200924 ¶ 8. These parties were deemed necessary parties to the lawsuit. *CB Construction*, 2021 IL App (1st) 200924 ¶ 26. Since the contractor failed to include these parties as defendants within the thirty days after it received the Section 34 demand, the court ruled that the lien was forfeited. *CB Construction*, 2021 IL App (1st) 200924 ¶ 30.

¶ 58    In its complaint, Welsch did not name one of the necessary parties, Continental

Construction, as a party. This defect is not curable. Under the Act, a party must file suit to enforce its lien claim within two years of its last date of completing its obligations. 770 ILCS 60/9 (West 2018). Welsch's last date of work was December 6, 2018, which meant that the deadline for it to file suit and name all necessary parties was December 6, 2020. Welsch failed to name all the necessary parties within the time allowed.

¶ 59    We conclude that Welsch's pleading was fatally flawed because it did not name as parties "all persons in the chain of contracts between the claimant and the owner" as required by section 11(b) of the Act. 770 ILCS 60/11(b) (West 2018). Given our determination that the failure to comply with section 11(b) justified the dismissal of Welsch's action with prejudice, we do not reach the parties' arguments that a second reason to dismiss the action was that Welsch did not allege that it sent a subcontractor's 90-day notice of its claim in compliance with section 24 of the Act. 770 ILCS 60/24 (West 2018). We affirm the judgment of the circuit court with respect to Welsch's action.

¶ 60    Recapping, we have addressed the appellants' arguments, found them unpersuasive, and affirm the judgment of the circuit court in these consolidated cases.

¶ 61    Affirmed.